IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES L. LUMPKIN,

                         Petitioner,

v.                                                    OPINION and ORDER

GRANT BERG,[1]                                      19-cv-1008-jdp

                         Respondent.

James L. Lumpkin, appearing by counsel, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He challenges a June 2015 judgment of conviction for possession with intent to deliver cocaine and heroin. He contends that his trial counsel was constitutionally ineffective by failing to impeach one of the state's witnesses. The state filed an answer, with records from the relevant state court proceedings, and the petition is fully briefed. For the reasons set forth below, I conclude that Lumpkin has failed to establish that the Wisconsin Court of Appeals unreasonably applied clearly established federal law when it rejected his claim and affirmed his conviction. Accordingly, his petition will be denied.

BACKGROUND

The following facts are taken from the petition and the state court records provided by Lumpkin and the state.

---

[1] I have amended the caption to reflect the name of the current superintendent of Gordon Correctional Center, where Lumpkin is currently housed.

**A. Lumpkin's trial**

In Monroe County case number 2014CF300, petitioner James Lumpkin was charged with possession with intent to deliver cocaine and heroin, delivery of heroin, and possession of THC. Lumpkin pleaded not guilty to the charges and proceeded to a jury trial.

The testimony at trial established that Lumpkin was arrested on July 16, 2014, in Sparta, Wisconsin, based on information provided to the police by Stacey Suiter, a resident of Tomah, Wisconsin. An investigator from the Tomah Police Department testified that Suiter had been arrested when she attempted to purchase heroin during a sting operation set up by law enforcement. Dkt. 10-1, at 116. Suiter admitted that she was attempting to purchase heroin, and she told the investigator that she had purchased heroin from someone named "Snoop" earlier that day, at a trailer park in Sparta. *Id.* at 121. The investigator searched Suiter's phone, which showed that she had exchanged several phone calls and text messages with individuals named Snoop and Kelly Larkin. *Id.* at 127.

After Suiter spoke with the investigator, she met with a detective, Clayton Tester. According to Tester's testimony at trial, Suiter told Tester that an acquaintance, Kelly Larkin, had asked her to obtain heroin for him. *Id.* at 244. Suiter had contacted Snoop, and then Larkin had driven Suiter to Sparta where she purchased heroin from Snoop. *Id.* Tester drove Suiter to the trailer park in Sparta, and Suiter pointed out the residence where she had purchased the heroin. *Id.* at 243. Tester was familiar with Snoop, and he showed Suiter a photo line-up including Lumpkin's photograph. Suiter identified Lumpkin as Snoop. Tester told Suiter that if she let law enforcement search the hotel room where she lived, she would not be prosecuted for the amount of heroin found in her room. *Id.* Suiter consented to the search, and she told Tester that two points of heroin would be found at the hotel. *Id.* (Testimony from

2

multiple witnesses at trial established that at the time, heroin was typically sold to users in bags containing one-tenth of a gram, called a "point," for $50. Users could sometimes pay less per point if they bought more than one point at a time. A user typically used one point at a time.) Law enforcement searched Suiter's hotel room, found two points of heroin, and then obtained a search warrant for the residence in Sparta identified by Suiter. *Id.* at 134–35.

Lumpkin was present at the residence when law enforcement arrived. He was arrested and searched, and police found a wad of money ($1,104) and several plastic bags with what appeared to be drugs in his pockets. *Id.* at 106. Inside the residence, police found two crack pipes, a mostly burned marijuana cigarette, and two cellular phones. *Id.* at 136. A police investigator testified at trial that the drugs in Lumpkin's pocket were packaged in a way consistent with how a seller would package them, with multiple small bags inside larger bags. *Id.* at 138. Later testing confirmed that the substances in the bag were heroin, cocaine and THC. *Id.* at 182, 185, 187. There were 3.1 grams of heroin divided into 22 baggies. One baggie had a full gram, and the other 21 baggies had 0.1 gram in each. Dkt. 16-1, at 5. There was also 2.1 grams of cocaine, divided between four baggies, and 1.6 grams of marijuana, divided between two baggies. *Id.*

The state called Stacey Suiter and Kelly Larkin as witnesses at trial. Suiter testified that during July 2014, she was addicted to heroin and prescription narcotics. *Id.* at 207. She never had much money, but she was able to obtain heroin by acting as a go-between for other users and heroin sellers. *Id.* at 223. She testified that on July 16, 2014, Larkin asked her to get heroin for him. *Id.* at 211. Suiter contacted Lumpkin, who she knew as Snoop, and arranged to meet him at the trailer residence in Sparta. The prosecutor asked Suiter about a text message that she had sent to Lumpkin that morning that said, "300 so full." Suiter testified that Larkin had

$300, and that she wanted a full gram of heroin. Lumpkin texted back, "cool." Suiter texted Lumpkin again when she was close to Sparta. She testified that she purchased a full gram of heroin from Lumpkin for $300, that she gave Larkin either six or seven points, and that she kept three points. She used one point immediately, and then she and Larkin drove back to Tomah. *Id.* at 216–17. She testified that she attempted to buy additional heroin later that day, during the sting arranged by police, because she thought the seller might have better drugs. *Id.* at 220. She told the police about the heroin in her hotel room because she was told that she would not be criminally charged for possession of heroin. *Id.* at 219. (Suiter was later charged criminally for child neglect and possession of narcotics, based on prescription drugs and drug paraphernalia found in her hotel room, but this evidence was not introduced during Lumpkin's trial.)

Defense counsel's cross-examination of Suiter was brief, lasting approximately two minutes. Counsel asked Suiter questions about her making a profit by obtaining heroin for Larkin, about her trying to buy heroin from multiple people in one day, and about how she kept her drugs in a hotel room that she shared with her children. *Id.* at 220. The state objected to the question about Suiter living in the hotel with her children, and defense counsel withdrew the question and ended his cross-examination. *Id.* at 221.

Larkin testified that he had gone with Suiter to Sparta to purchase heroin on July 16, 2014, around noon. *Id.* at 225, 230. Larkin could not remember details about how much heroin they had bought or who they bought it from, but he did remember giving Suiter the money, her leaving his vehicle, and her returning with heroin. He testified that he did not think she purchased a full gram of heroin, and that he did not think that he had ever seen more than three points of heroin at a one time. He testified that he was using two to three points a day

4

at that time, so his memory was impaired. *Id.* at 227. (The police investigator also testified that people who use drugs have difficulty recalling specific details. *Id.* at 175.)

The state also called Jaime West, a friend of Lumpkin's, as a witness. West testified that she had seen Lumpkin more than 100 times in 2014, and that she had never known him to have a job. *Id.* at 233–34. She had seen him carry more than $100 in cash. *Id.*

Finally, the state also introduced transcripts of telephone conversations that Lumpkin had while he was in jail after his arrest. During one phone conversation, Lumpkin was speculating with another individual about who might have turned him in to the police. Lumpkin confirmed that someone named Stacey had come to see him before he was arrested. *Id.* at 249. In another conversation, Lumpkin suggested that he did not have a large amount of drugs on him, and the caller stated, "[t]hat was still too much though, to get caught in your pocket." *Id.* at 250.

The defense did not call any witnesses or introduce evidence. The jury acquitted Lumpkin of possession of cocaine, but it found him guilty of the four remaining counts. Lumpkin was sentenced to seven years of imprisonment, to be followed by five years of extended supervision.

## B. Postconviction proceedings

Lumpkin filed a postconviction motion challenging, among other things, trial counsel's effectiveness in impeaching Stacey Suiter at trial. He argued that trial counsel was deficient for failing to ask Suiter about her inconsistent statements, her motivation to lie, evidence that she sold prescription drugs from her hotel room, and her criminal convictions. The circuit court held a hearing on the motion, at which trial counsel testified.

Trial counsel testified that he knew that impeaching Suiter's reliability was vital to the defense. He stated that his cross-examination strategy was to "sufficiently cross-examine her without berating or going overly aggressive." Dkt. 10-3, at 25. He stated that he wanted to "let the jury see that [Suiter] was a user, not the world's most reliable person," but that he did not want to "push too much beyond that" because it might "suddenly make her look like a victim." *Id.* at 24–25. As for Suiter dealing drugs from her hotel room, trial counsel testified that he did not think the information would make Suiter look bad enough that the jury would disbelieve her. *Id.* Trial counsel also stated that he "didn't see any benefit" in impeaching Suiter with her criminal convictions stemming from the July 2014 search of her hotel room, even though the convictions had resulted in her being on supervision with a diversion agreement. *Id.* at 16.

Postconviction counsel pointed out that after she was arrested, Suiter made statements to the police suggesting that she was desperate to stay out of jail. She stated to Detective Tester, "What can I possibly do to get out tonight?" and "I will do anything to get out tonight." Suiter also made several inconsistent statements to the police about the amount of heroin she bought from Lumpkin that morning, how much she kept for herself, and how much she gave to Larkin. When asked why he did not impeach Suiter with her motive to lie or her prior inconsistent statements, trial counsel testified that he was concerned that impeaching Suiter along these lines might open the door to testimony about other transactions, or at least suggest to the jury that there had been more transactions between Suiter and Lumpkin. *Id.* at 30–31. (Suiter had told police that she had purchased heroin from Lumpkin more than 20 times.) Trial counsel stated that he "was concerned that as soon as we start throwing a bunch of additional numbers, the jury is going to start saying okay, there was a six-point transaction, there is that one-gram transaction, there were three-point transactions. I didn't want to go there." *Id.* at 31. Trial

6

counsel stated that he thought that focusing on inconsistencies in the amount Suiter purchased from Lumpkin would merely "hammer home to the jury [that she] bought it from him." *Id.* Trial counsel also testified that because Suiter was an admitted drug addict, he did not think it surprising that she could not keep information straight. *Id.* at 16.

The circuit court found that although trial counsel had been deficient for not impeaching Suiter with her criminal convictions, Lumpkin was not prejudiced by the deficient performance. The court concluded that there was no reasonable probability of a different outcome, in light of the evidence of the drugs and cash found on Lumpkin and the text messages between Lumpkin and Suiter. *Id.* at 51–52.

## C. Court of appeals

Lumpkin appealed, renewing his argument that trial counsel was ineffective for failing to impeach Stacey Suiter with her prior convictions, motive to lie, drug dealing, and inconsistent statements. The court of appeals concluded that trial counsel performed deficiently by failing to impeach Suiter with her prior convictions, status on supervision with a diversion agreement, and her motive to lie, including her statements of desperation to the police after her arrest. But the court concluded that Lumpkin had been prejudiced only on the count charging him with delivery of heroin to Suiter. The court reversed Lumpkin's conviction as to the delivery of heroin count, but it affirmed the conviction in all other respects. The court issued three decisions on the appeal.

In its first decision, the court applied the incorrect legal standard to Lumpkin's ineffective assistance claim. Dkt. 1-2. Instead of applying the *Strickland* prejudice standard, which requires the petitioner to show that without counsel's errors, there was a "reasonable

probability" of a different result, the court applied the "sufficiency of the evidence" standard, stating that:

> We conclude that there is no prejudice on these counts. Even if the jury were to disbelieve the informant's testimony entirely, we are sufficiently confident that the jury would still have convicted on these counts. Although it is true that certain common physical indicia of intent to deliver were not found in this case, an inference of that intent could still reasonably be drawn from the way the substances were packaged and the significant amount of cash Lumpkin was carrying.

*Id.* at 6–7.

Lumpkin filed a petition for review with the Wisconsin Supreme Court, asserting that the court of appeals had applied the wrong standard to his ineffective assistance claim. The court of appeals then withdrew its opinion and issued a new opinion. This time, the court applied a "more-likely-than-not" standard, stating that:

> Although it is true that certain common physical indicia of intent to deliver were not found in this case, we conclude that the jury would most likely still have inferred that intent from the way the substances were packaged and the significant amount of cash Lumpkin was carrying.

Dkt. 1-3, at 6–7.

Lumpkin filed a motion for reconsideration, arguing that the court still had applied the wrong standard. Dkt. 9-6. The court of appeals withdrew its opinion again, and it issued a third opinion one week later. Dkt. 9-7; Dkt. 1-4. The court made minor alterations that brought the court closer to the *Strickland* standard, stating:

> Although it is true that certain common physical indicia of intent to deliver were not found in this case, we conclude that *it is highly likely that* the jury would still have inferred that intent from the way the substances were packaged and the significant amount of cash Lumpkin was carrying. *Accordingly, there is no reasonable probability that the jury would have had a reasonable doubt as to Lumpkin's guilt.*

8

Dkt. 1-4, at 6–7 (emphasis added).

Lumpkin filed a second petition of review with the Wisconsin Supreme Court, but his petition was denied. On remand, Lumpkin's conviction for delivery of heroin to Suiter was reduced to a charge of narcotics possession, to which Lumpkin pleaded guilty. Lumpkin was given a time-served jail sentence. Lumpkin has also completed his sentence for possession of THC. In his habeas petition, he challenges only his convictions for possession with intent to deliver heroin and cocaine.

## ANALYSIS

Lumpkin contends that he is entitled to habeas relief because his trial counsel failed to cross-examine Stacey Suiter effectively. Lumpkin argues that counsel should have questioned Suiter about her convictions, her motive to lie, the inconsistencies in her statements to the police, and her drug dealing. He argues that if counsel had done so, there is a reasonable probability that he would have been acquitted of the possession with intent to deliver charges.

A federal court may grant habeas relief following an adjudication on the merits in state court only if that decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §§ 2254(d)(1)–(2); *Czech v. Melvin*, 904 F.3d 570, 573 (7th Cir. 2018). Lumpkin argues that the court should consider the Wisconsin Court of Appeals' three opinions in determining whether the court's analysis was reasonable under § 2254(d). But the court of appeals withdrew the first and second opinions. The court's third-issued opinion was the last reasoned decision on the merits of Lumpkin's claim, so its analysis

9

deserves deference as long as that analysis is reasonable. *See Gage v. Richardson*, 978 F.3d 522, 529 (7th Cir. 2020).

In its third decision, the Wisconsin Court of Appeals correctly stated that to succeed on his ineffective assistance claim, Lumpkin must show both that his counsel's performance was deficient and that he was prejudiced as a result. Dkt. 1-4, at 2 (citing *Strickland v. Washington*, 446 U.S. 668, 687 (1984)). To demonstrate deficient performance, Lumpkin must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. To demonstrate prejudice, Lumpkin must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

## A. Deficient performance

The court of appeals concluded that trial counsel was deficient to failing to impeach Suiter with her criminal convictions, her supervision status, and video recorded statements suggesting a motive to lie. As the court noted, "these were low-hanging fruit that it appears could have been used without great consumption of time and with low risk that other information potentially damaging to Lumpkin would be admitted." Dkt. 1-4, ¶ 16. But the court rejected Lumpkin's argument that counsel was deficient for failing to impeach Suiter with her inconsistent statements and evidence of drug dealing. In his habeas petition, Lumpkin challenges the court of appeals' conclusion that counsel was not deficient for failing to impeach Suiter with all available impeachment material.

Because the Wisconsin Court of Appeals addressed this argument on the merits, Lumpkin can succeed only if he shows that that the court's determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond

10

any possibility for fairminded disagreement." *Gage*, 978 F.3d at 529 (*quoting Harrington v. Richter*, 562 U.S. 86, 89 (2011)). So long as the state court "took the constitutional standard seriously and produced an answer within the range of defensible positions," this court must deny relief. *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006) (citation omitted).

Lumpkin argues that counsel should have used all potential impeachment evidence against Suiter to undermine her credibility, as Suiter was the only witness to testify about any drug-dealing activities by Lumpkin. First, Lumpkin argues that counsel was deficient for failing to present evidence that Suiter sold prescription drugs from her hotel room. Second, he argues that counsel also should have presented evidence that Suiter made several inconsistent statements to police about the quantity and price of the heroin she purchased from Lumpkin, how she and Kelly Larkin divided the drugs, and about whether she used any of the heroin. If counsel had presented this evidence, Lumpkin argues, the jury might have doubted Suiter's credibility and doubted her testimony that she purchased heroin from Lumpkin. The jury might have concluded instead that Suiter was the drug dealer, and that she had lied about purchasing heroin from Lumpkin to avoid being charged herself with heroin and prescription pill distribution.

In rejecting these arguments, the Wisconsin Court of Appeals stated that:

> Trial counsel could reasonably believe that attempting to delve into these areas would be time consuming and difficult to explain, and could run the risk of bringing out additional information that would not be favorable to Lumpkin, such as testimony by the informant about previous transactions with Lumpkin.

Dkt. 1-4, at 4. The court also noted that "[t]hese kinds of inconsistencies can reasonably be expected from a person who is using a substance and responding to a stressful situation." *Id.* at 3.

The court did not explain why questioning Suiter about her prior inconsistent statements, or the evidence of her drug dealing, would be time consuming or difficult to explain, and I agree with Lumpkin that those are not persuasive reasons to justify trial counsel's cross-examination strategy. Counsel's cross-examination of Suiter lasted approximately two minutes, so there was little risk that introducing additional topics would lengthen the cross-examination unreasonably. In addition, the evidence of inconsistent statements and drug dealing was not complicated, and likely would not have been confusing to the jury.

But federal courts may not disturb the judgments of state courts unless "each ground supporting the state court decision is examined and found to be unreasonable." *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020). And in this instance, the Wisconsin Court of Appeals provided additional grounds for rejecting Lumpkin's deficient performance arguments. The court dismissed the significance of Suiter's inconsistent statements, pointing out that she was an admitted drug user who was in a stressful situation. In addition, the court stated that it was reasonable for trial counsel to be concerned about opening the door to testimony from Suiter about previous drug purchases from Lumpkin. Dkt. 1-4, at 4. These conclusions were not unreasonable, and they have some support in the record.

Defense counsel could have decided reasonably that impeaching Suiter with minor inconsistencies in her prior statements to police would not be effective impeachment. It was established at trial that Suiter was addicted to heroin and prescription drugs during the relevant time period, and law enforcement testified that drug users had difficulty remembering specific details. In addition, Suiter's testimony had remained consistent in significant ways, including who she purchased from, what drug she purchased, who she purchased the heroin for, the time of day she purchased the heroin, and that she had purchased heroin from Lumpkin on more

12

than one occasion. Attempting to show minor inconsistencies in Suiter's statements could have resulted in confirming the otherwise consistent nature of her statements against Lumpkin.

Counsel's concerns about opening the door to testimony about additional transactions between Suiter and Lumpkin also had support in the record. Although there was significant evidence that Suiter was a heroin user and that she sold prescription drugs, there was no evidence in the record that Suiter sold heroin. If counsel had questioned Suiter about drug dealing in an attempt to suggest that Suiter sold heroin to Lumpkin, the strategy would have been ineffective and might have opened the door to Suiter testifying about previous purchases from Lumpkin. At the very least, the state would have attempted to introduce additional evidence about Suiter's previous purchases from Lumpkin.

In sum, I might have analyzed counsel's performance somewhat differently, but the Wisconsin Court of Appeals' deficiency analysis is not unreasonable and is at least one "plausible outcome." *See Frentz v. Brown*, 876 F.3d 285, 295 (7th Cir. 2017).

**B. Prejudice**

Lumpkin also challenges the Wisconsin Court of Appeals' prejudice analysis. The court concluded that even though trial counsel was deficient in some ways, counsel's errors were not prejudicial. First, Lumpkin argues that the court's analysis of the prejudice prong is not entitled to deference under § 2254(d) because the court applied the incorrect legal standard. This argument is not persuasive. As noted above, the court's third-issued opinion identified the correct prejudice standard in two areas of the opinion. The court stated that: (1) "to demonstrate prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different";

and (2) "there is no reasonable probability that the jury would have had a reasonable doubt as to Lumpkin's guilt." Dkt. 1-4, at 2, 7.

Lumpkin argues that despite identifying the correct standard twice, the court applied the incorrect standard when it stated that it was "highly likely" that the jury would have inferred intent to deliver from other trial evidence. Lumpkin argues that this "highly likely" standard is contrary to *Strickland*, as explained in *Lee v. United States*, 137 S. Ct. 1958, 1966–69 (2017). But *Lee* does not apply to this case. *Lee* concerned the assessment of prejudice within the context of the taking of a plea by a person whose attorney misadvised him about the fact that his conviction would lead to mandatory deportation. *Id.* at 1963. The court found prejudice even though Lee was "highly likely" to lose at trial, because Lee had proven that he would have chosen a trial on the remote chance of winning acquittal and avoiding deportation. *Id.* at 1966–67. In contrast to *Lee*, Lumpkin's case does not involve an assessment of whether Lumpkin would have chosen to plead guilty rather than proceed to trial.

In addition, it is well-established that a state court's use of incomplete shorthand for the *Strickland* standard does not justify relief, as long as the state court makes clear its understanding of the correct standard. *See Fayemi v. Ruskin*, 966 F.3d 591, 594 (7th Cir. 2020) (a state court's use of "incomplete or inaccurate shorthand" does not justify relief "as long as the state court makes clear its understanding of the correct standard")(citing cases). In this instance, the court identified the correct standard twice, and then proceeded to explain why there was no reasonable probability of a different result. Because the state court did not apply a standard "contrary to" *Strickland*, the only question for this court is whether the court applied *Strickland* "unreasonably."

14

The court of appeals concluded that Lumpkin had not shown prejudice because his intent to distribute drugs was clear from other evidence introduced at trial, independent of Suiter's testimony. The court's conclusion was reasonable. Trial evidence established that Lumpkin had a significant amount of drugs on his person when he was arrested: the equivalent of 31 individual points of heroin and 2.1 grams of cocaine. The manner in which the drugs were packaged indicated that they had been prepared for street-level sale. Lumpkin had $1,104 in cash, mostly in bills of $20 or less, despite his friend never knowing him to have a job. There was no evidence found on Lumpkin, such as needles, suggesting that he was a heroin user. Suiter's text to Lumpkin, "300 so full," and Lumpkin's response, "cool," supported the narrative that Suiter purchased drugs from Lumpkin. The recorded jail calls in which Lumpkin speculates with other individuals about who may have turned on him, and whether the quantity of drugs found on him was large, support an inference that Lumpkin distributed drugs.

And despite Lumpkin's arguments, there was no evidence to support his theory that Suiter sold the large amount of heroin to Lumpkin that was found in his pockets. Suiter had only two points of heroin in her hotel room, and she did not have cash equivalent to what she would have received for the amount of heroin that Lumpkin possessed. Larkin confirmed Suiter's testimony that they had purchased heroin earlier in the day, and law enforcement confirmed that Suiter had attempted to buy heroin. In light of this evidence, the Wisconsin Court of Appeals' prejudice analysis was reasonable. Even if defense counsel had impeached Suiter on all of the grounds identified by Lumpkin, there is no reasonable probability that the jury would have had a reasonable doubt as to Lumpkin's guilt.

## C. Certificate of appealability

The only remaining question is whether to grant petitioner a certificate of appealability. Under Rule 11 of the Rules Governing Section 2254 Cases, the court must issue or deny a certificate of appealability when entering a final order adverse to a petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). This means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted).

Lumpkin is entitled to a certificate of appealability on his claim that the Wisconsin Court of Appeals' application of *Strickland* was unreasonable or contrary to federal law. Although I am not persuaded by Lumpkin's arguments, reasonable jurists might have resolved this claim differently.

ORDER

IT IS ORDERED that:

1. Petitioner James L. Lumpkin's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED.

2. Lumpkin is GRANTED a certificate of appealability.

Entered March 15, 2021.

                                                  BY THE COURT:

                                                  /s/

                                                  _____

                                                  JAMES D. PETERSON
                                                  District Judge